1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JUAN RODRIGUEZ, on behalf of himself and )
others similarly situated,                                     )
                                                                            )      Case No.: 2:14-cv-01537-GMN-GWF
                              Plaintiff,                         )
          vs.                                                        )      **ORDER**
                                                                            )
AT&T SERVICES, INC.,                              )
                                                                            )
                              Defendant.                       )
                                                                            )

10      Pending before the Court is the Motion to Compel Arbitration (ECF No. 11) filed by

11   Defendant AT&T Services, Inc. ("AT&T").  Plaintiff Juan Rodriguez ("Plaintiff") filed a

12   Response (ECF No. 17), and AT&T filed a Reply (ECF No. 21).  For the reasons discussed

13   below, AT&T's Motion to Compel Arbitration (ECF No. 11) is **DENIED**.

14   **I.        BACKGROUND**

15      According to the Complaint, Plaintiff called AT&T on December 17, 2013 to inquire

16   about obtaining personal wireless phone service. (Compl. ¶ 18, ECF No. 1).  However, after

17   discussing several of the potential service plans, Plaintiff decided against acquiring a line of

18   service from AT&T. (*Id.* ¶¶ 19–20).  Before terminating the call, Plaintiff checked with the

19   AT&T agent to ensure that AT&T would not submit a credit report inquiry for him and was

20   assured over the phone that no such inquiry would be made. (*Id.* ¶¶ 21–22).  Despite this

21   assurance, however, Plaintiff received a letter from AT&T approximately one week after the

22   phone call, informing him that AT&T had in fact submitted a credit report inquiry "as a result

23   of" the phone call.[1] (*Id.* ¶ 23).  Additionally, upon later review of his credit report, Plaintiff

24   _____

25   [1] The "letter" attached to Plaintiff's Complaint allegedly informing him of the credit report inquiry does not in
fact say anything about the December 17, 2013 phone call or the submission of a credit report inquiry. *See*
(Notice Letter, ECF No. 1-1).  Instead, the letter, which is entitled "NOTICE," merely contains two sentences

1  verified that an unauthorized inquiry had been submitted to Equifax on March 27, 2013.[2] (*Id.* ¶

2  24).  In response to the unauthorized submission of a credit report inquiry, Plaintiff filed the

3  current proposed class action, asserting claims for: (1) violation of the Fair Credit Reporting

4  Act ("FCRA") and (2) consumer fraud in violation of the Nevada Deceptive Trade Practices

5  Act ("NDTPA"). (*Id.* ¶¶ 44–51).

6  In its Motion to Compel, AT&T provides a different set of facts concerning the

7  interactions between AT&T and Plaintiff.  According to AT&T, its records show that Plaintiff

8  purchased an Apple iPhone from an AT&T retail store in Reno, Nevada on August 31, 2012

9  and opened an account for use of the phone on AT&T's network. (Shurtz Decl. ¶¶ 4–5, ECF

10  No. 1-2).  This account was opened in the name of "Fierce Entertainment," a business "owned"

11  by Plaintiff. (*Id.* ¶ 4); *see* (List of Business Licenses, Ex. 3 to Tierney Decl., ECF No. 11-3)

12  (showing a business license for Fierce Entertainment was issued to Plaintiff); (Pl. Decl. ¶ 2,

13  ECF No. 17-1) ("I am the owner of Fierce Entertainment.").

14  At the time the account for Fierce Entertainment was created, Plaintiff accepted a

15  "Wireless Customer Agreement" (the "Customer Agreement") by pressing a button labeled

16  "Accept" after scrolling through the text of the Customer Agreement. (Kilpatrick Decl. ¶¶ 3–8,

17  ECF No. 11-5); *see also* (Receipt, Ex. 1 to Harris Decl., ECF No. 11-4) (receipt for the

18  purchase of an iPhone and wireless plan on August 31, 2012 on behalf of Fierce Entertainment

19

20

21

22  stating that the Equal Opportunity Act prohibits discriminating against certain groups of individuals and that
    compliance with this act is administered by the Federal Trade Commission. (*Id.*).  The letter then concludes with
    the signature line: "AT&T/PO BOX 5093/CAROL STREAM IL 60197-5093." (*Id.*).

23

24  [2] Plaintiff's Complaint appears to be premised on the fact that AT&T submitted an inquiry after being
    specifically asked not to do so during the December 17, 2013 phone call. *See* (Compl. ¶¶ 18–24, ECF No. 1).
    However, Plaintiff also alleges that the offending credit inquiry occurred on March 27, 2013, approximately nine

25  months before the allegedly triggering phone call. *See* (*id.*); *see also* (Screen Shot of Credit Report, ECF No. 1-
    2) (showing the credit injury occurred on March 27, 2013).  Plaintiff does not explain this obvious inconsistency
    in his Complaint or in his Response to the Motion to Compel.

allegedly bearing Plaintiff's signature).  The Customer Agreement accepted by Plaintiff

contains an arbitration provision that states:

> **2.2    Arbitration Agreement**
> (1) AT&T and you agree to arbitrate **all disputes and claims** between us.  This
> agreement to arbitrate is intended to be broadly interpreted. . . .
>
> References to "AT&T," "you," and "us" include our respective subsidiaries,
> affiliates, agents, employees, predecessors in interest, successors, and assigns, as
> well as all authorized or unauthorized users or beneficiaries of services or Devices
> under this or prior Agreements between us. . . .  **You agree that, by entering into
> this Agreement, you and AT&T are each waiving the right to a trial by jury
> or to participate in a class action.**

(Customer Agreement ¶ 2.2, Ex. 2 to Shurtz Decl., ECF No. 11-2).

AT&T's records show that approximately five months later on January 28, 2013,

Plaintiff called AT&T to inquire about switching Fierce Entertainment's wireless service

account to a business service account also in the name of Fierce Entertainment. (Clary Decl. ¶

4, ECF No. 11-2).  During this phone call, Plaintiff elected to transfer the wireless service

account to a business service account, and as part of the transfer, Plaintiff gave a verbal

acceptance of a "Mobile Business Agreement" (the "Business Agreement"). (*Id.*); *see* (Business

Records Screenshot, Ex. 3 to Clary Decl., ECF No. 11-1) (showing a transfer of the accounts on

January 28, 2013); (Agreement Signature Screenshot, Ex. 4 to Clary Decl., ECF No. 11-1)

(indicating a verbal acceptance of the Business Agreement by Plaintiff on January 28, 2013).

The three-page Business Agreement incorporates by reference a set of "General Terms and

Conditions." *See* (Business Agreement at 1, Ex. 1 to Clary Decl., ECF No. 11-1).  Included in

the General Terms and Conditions is an arbitration provision that states:

> **9. Arbitration**.  The parties agree to exercise their best efforts to settle any dispute
> arising out of or related to this Agreement through good faith negotiation.  Any
> dispute arising out of or related to this Agreement that cannot be resolved by
> negotiation shall be resolved by binding arbitration administered by the American
> Arbitration Association ("AAA") under its Commercial Arbitration Rules . . . .
> THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE
> OTHER ONLY IN ITS INDIVIDUAL CAPACITY AND NOT AS A

1
2
3
4

PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  Furthermore, unless both parties agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific proviso is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

5   (General Terms and Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1).

6   On September 21, 2014, approximately twenty months after transferring accounts and

7   accepting the Business Agreement, Plaintiff filed his Complaint. (Compl., ECF No. 1).  AT&T

8   then filed the pending Motion to Compel Arbitration.

9   **II.   LEGAL STANDARD**

10   Section 2 of the Federal Arbitration Act (the "FAA") provides that:

11
12
13

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

14   9 U.S.C. § 2.  "In enacting § 2 of the [FAA], Congress declared a national policy favoring

15   arbitration and withdrew the power of the states to require a judicial forum for the resolution of

16   claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v.*

17   *Keating*, 465 U.S. 1, 10 (1984).  Courts shall place arbitration agreements "upon the same

18   footing as other contracts." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior*

19   *Univ.*, 489 U.S. 468, 478 (1989).

20   Under the FAA, parties to an arbitration agreement may seek an order from the Court to

21   compel arbitration. 9 U.S.C. § 4.  The FAA "leaves no place for the exercise of discretion by a

22   district court, but instead mandates that district courts *shall* direct the parties to proceed to

23   arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*

24   *Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  Thus, the Court's "role under the Act is . . .

25   limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2)

whether the agreement encompasses the dispute at issue." *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1261 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (internal quotations omitted)).  If a district court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1276–77 (9th Cir. 2006).

## III.   DISCUSSION

In its motion, AT&T contends that Plaintiff is obligated under the Business Agreement[3] to bring his claims against it in arbitration. (Mot. to Compel 2:22–27, ECF No. 11).  However, for the reasons explained below, the arbitration provision at issue is unconscionable, and thus invalid and unenforceable.

### A.  Nevada Law Controls

"In determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  In this case, however, there is some question about which state's law to apply because while the Business Agreement was entered into by Plaintiff in Nevada, the incorporated General Terms and Conditions contains a choice-of-law provision declaring that Georgia law controls. *See* (General Terms and Conditions, Ex. 7 to Clary Decl. ¶ 13.5, ECF No. 11-1).  "In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state. . . ." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).

---

[3] Although Plaintiff contends that both arbitration provisions are unenforceable because AT&T is unfairly attempting to compel arbitration under the both provisions simultaneously, (Resp. 7:11–9:22, ECF No. 17), AT&T makes it clear in its filings that its position is that the arbitration provision incorporated into the Business Agreement supersedes the Customer Agreement and therefore controls. *See* (Mot. to Compel 6:3–18, ECF No. 11); (AT&T Reply 3:10–22, ECF No. 21). Accordingly, in ruling on the motion, the Court will determine whether the arbitration provision incorporated into the Business Agreement compels Plaintiff to arbitrate his claim.

1  "Nevada's choice-of-law principles permit parties within broad limits to choose the law that

2  will determine the validity and effect of their contract.  The situs fixed by the agreement,

3  however, must have a substantial relation with the transaction, and the agreement must not be

4  contrary to the public policy of the forum, or other interested state." *Progressive Gulf Ins. Co.*

5  *v. Faehnrich*, 327 P.3d 1061, 1064 (Nev. 2014) (citations omitted).

6      Here, the arbitration provision contains a class action waiver, and Nevada possesses a

7  public policy against class action waivers in arbitration agreements, which is not shared by

8  Georgia. *Compare Picardi v. Eighth Judicial Dist. Court of State, ex rel. Cnty. of Clark*, 251

9  P.3d 723, 728 (Nev. 2011) ("Because we conclude that the class action waiver in the arbitration

10  agreement violates public policy, it is unenforceable.") *with Honig v. Comcast of Georgia I,*

11  *LLC*, 537 F. Supp. 2d 1277, 1284–90 (N.D. Ga. 2008) ("For all of these reasons, the Court

12  rejects Honig's argument that the class action waiver is unconscionable.").  Furthermore,

13  because the Business Agreement was entered into with a Nevada resident for the use of a phone

14  purchased in Nevada and a service plan primarily used in Nevada, Nevada has a material

15  interest in this case. *See Progressive Gulf Ins. Co.*, 327 P.3d at 1064-67 (applying Mississippi

16  law under a policy's choice-of-law provision despite the presence of a household exclusion

17  which violated Nevada public policy because the policy was applied for, delivered, and

18  renewed in Mississippi by Mississippi residents).  Therefore, under Nevada's choice-of-law

19  rules, this Court must apply Nevada law when determining whether the arbitration provision is

20  valid and enforceable despite the provision in the General Terms and Conditions stating

21  Georgia law controls. *Id.* at 1064 ("Had the policy been delivered in Nevada, to a Nevada

22  resident owning a car principally garaged in Nevada, then-existing case law would have

23  invalidated the household exclusion to the extent it eliminated the statutorily mandated

24  $15,000/$30,000 minimum liability coverage specified in NRS 485.3091.").

25

**B. The Arbitration Provision is Unconscionable and Invalid**

Nevada possesses a strong public policy in favor of arbitration, and arbitration clauses are generally enforceable. *Gonski v. Second Judicial Dist. Court of State ex rel. Washoe*, 245 P.3d 1164, 1168 (Nev. 2010).  "Nevertheless, courts may invalidate unconscionable arbitration provisions." *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004); *see also Burch v. Second Judicial Dist. Court of State ex rel. Cnty. of Washoe*, 118 Nev. 438, 443, 49 P.3d 647, 650 (2002) ("Unconscionability, therefore, is a legitimate ground upon which to refuse to enforce the . . . arbitration clause.").

 "Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a clause as unconscionable." *D.R. Horton, Inc.*, 96 P.3d at 1162 (citing *Burch*, 49 P.3d at 650).  "An arbitration clause is procedurally unconscionable when a party has no meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." *Gonski*, 245 P.3d at 1169. "Substantive unconscionability, in contrast, is based on the one-sidedness of the arbitration terms." *Id.*

Here, the Business Agreement with the incorporated General Terms and Conditions is a contract of adhesion because AT&T presented it to Plaintiff on a "take it or leave it" basis without any real opportunity to bargain over its terms. *See Burch*, 49 P.3d at 649 ("This court has defined an adhesion contract as a standardized contract form offered to consumers on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain."); *see* (Clary Decl. ¶¶ 4–6, ECF No. 11-2) (explaining the process by which Plaintiff was presented with and verbally accepted the Business Agreement over the phone, after which the actual terms of the agreement were emailed to him).  Accordingly, the Business Agreement is procedurally unconscionable under Nevada law. *See Gonski*, 245 P.3d at 1169.

1   However, "adhesion contracts are not unenforceable per se." *Mallin v. Farmers Ins.*

2   *Exch.*, 839 P.2d 105, 118 (Nev. 1992).  For an adhesion contract to be unenforceable, it must

3   also be substantively unconscionable; in other words, its terms must also be unduly oppressive.

4   *See Obstetrics & Gynecologists William G. Wixted, M.D., Patrick M. Flanagan, M.D., William*

5   *F. Robinson, M.D. Ltd. v. Pepper*, 693 P.2d 1259, 1261 (Nev. 1985) ("An adhesion contract

6   need not be unenforceable if it falls within the reasonable expectations of the weaker or

7   'adhering' party and is not unduly oppressive."); *see also Gonski*, 245 P.3d at 1169 ("[A]

8   showing of both types of unconscionability is necessary before an arbitration clause will be

9   invalidated . . . .  Generally, in considering substantive unconscionability, courts look for terms

10  that are 'oppressive.'").

11      Here, the arbitration provision incorporated into the Business Agreement prohibits the

12  parties from bringing a class action before a court or arbitrator.[4] *See* (General Terms and

13  Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1) ("The parties agree that each may bring

14  claims against the other only in its individual capacity and not as a plaintiff or class member in

15  any purported class or representative proceeding.  Furthermore, . . . the arbitrator may not . . .

16  preside over any form of a representative or class proceeding.") (emphasis omitted).  Such a

17  term is substantively unconscionable under Nevada law because in cases where the potential

18  recovery for individual plaintiffs is modest, it would prevent plaintiffs from obtaining any

19  remedy for their claims. *See Picardi*, 251 P.3d at 727–28 ("Nevada's strong public policy in

20  favor of class actions [exists] in order to provide multiple plaintiffs, who individually may have

21  a valid but small claim, an adequate remedy at law.").  Similar class action waivers have also

22  been found unconscionable by other courts because, in the context of customer adhesion

23

24

25

---

[4] The arbitration provision contained in the Customer Agreement contains a similar class action waiver. *See* (Customer Agreement ¶ 2.2, Ex. 2 to Shurtz Decl., ECF No. 11-2). ("You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.") (emphasis omitted).

contracts, such terms are manifestly one-sided. *See, e.g.*, *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003) ("[A]lthough styled as a mutual prohibition on representative or class actions . . . [i]t is not only difficult to imagine AT&T bringing a class action against its own customers, but AT&T fails to allege that it has ever or would ever do so."). Therefore, the class action waiver in the Business Agreement arbitration provision violates Nevada public policy and is substantively unconscionable. Accordingly, the arbitration provision in the Business Agreement is both procedurally and substantively unconscionable under Nevada law, and thus unenforceable.[5]

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that Defendant AT&T's Motion to Compel Arbitration (ECF No. 11) is **DENIED**.

**DATED** this ___21___ day of August, 2015.

_____

Gloria M. Navarro, Chief Judge
United States District Court

---

[5] The Court also notes that even if the rest of the arbitration provision is not substantively unconscionable, because the arbitration provision provides that it is void if the class action waiver is found to be unenforceable, there is no basis on which the Court could sever that term and compel arbitration. *See* (General Terms and Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1). ("If [the class action waiver] is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.") (emphasis omitted).