**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JUAN RODRIGUEZ, on behalf of himself and others similarly situated,

         Plaintiff,

  vs.

AT&T SERVICES, INC.,

         Defendant.

Case No.: 2:14-cv-01537-GMN-GWF

**ORDER**

Pending before the Court is the Motion to Reconsider Order (ECF No. 33) filed by Defendant AT&T Services, Inc. ("AT&T"), seeking consideration of this Court's Order (ECF No. 29) denying AT&T's Motion to Compel Arbitration (ECF No. 11). Plaintiff Juan Rodriguez ("Plaintiff") has also filed a Response (ECF No. 39). For the reasons discussed below, the Court **GRANTS** AT&T's Motion to Reconsider, and upon reconsideration, the Court also **GRANTS** AT&T's Motion to Compel.

**I.     BACKGROUND**

According to the Complaint, Plaintiff called AT&T on December 17, 2013 to inquire about obtaining personal wireless phone service. (Compl. ¶ 18, ECF No. 1). However, after discussing several of the potential service plans, Plaintiff decided against acquiring a line of service from AT&T. (*Id.* ¶¶ 19–20). Before terminating the call, Plaintiff checked with the AT&T agent to ensure that AT&T would not submit a credit report inquiry for him and was assured over the phone that no such inquiry would be made. (*Id.* ¶¶ 21–22). Despite this assurance, however, Plaintiff received a letter from AT&T approximately one week after the phone call, informing him that AT&T had in fact submitted a credit report inquiry "as a result

of" the phone call.[1] (*Id.* ¶ 23). Additionally, upon later review of his credit report, Plaintiff verified that an unauthorized inquiry had been submitted to Equifax on March 27, 2013.[2] (*Id.* ¶ 24). In response to the unauthorized submission of a credit report inquiry, Plaintiff filed the current proposed class action, asserting claims for: (1) violation of the Fair Credit Reporting Act ("FCRA") and (2) consumer fraud in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"). (*Id.* ¶¶ 44–51).

In its Motion to Compel, AT&T provides a different set of facts concerning the interactions between AT&T and Plaintiff. According to AT&T, its records show that Plaintiff purchased an Apple iPhone from an AT&T retail store in Reno, Nevada on August 31, 2012 and opened an account for use of the phone on AT&T's network. (Shurtz Decl. ¶¶ 4–5, ECF No. 11-2). This account was opened in the name of "Fierce Entertainment," a business "owned" by Plaintiff. (*Id.* ¶ 4); *see* (List of Business Licenses, Ex. 3 to Tierney Decl., ECF No. 11-3) (showing a business license for Fierce Entertainment was issued to Plaintiff); (Pl. Decl. ¶ 2, ECF No. 17-1) ("I am the owner of Fierce Entertainment.").

At the time the account for Fierce Entertainment was created, Plaintiff accepted a "Wireless Customer Agreement" (the "Customer Agreement") by pressing a button labeled "Accept" after scrolling through the text of the Customer Agreement. (Kilpatrick Decl. ¶¶ 3–8, ECF No. 11-5); *see also* (Receipt, Ex. 1 to Harris Decl., ECF No. 11-4) (receipt for the

---

[1] The "letter" attached to Plaintiff's Complaint allegedly informing him of the credit report inquiry does not in fact say anything about a December 17, 2013 phone call or the submission of a credit report inquiry. *See* (Notice Letter, ECF No. 1-1). Instead, the letter, which is entitled "NOTICE," merely contains two sentences stating that the Equal Opportunity Act prohibits discriminating against certain groups of individuals and that compliance with this act is administered by the Federal Trade Commission. (*Id.*). The letter then concludes with the signature line: "AT&T/PO BOX 5093/CAROL STREAM IL 60197-5093." (*Id.*).

[2] Plaintiff's Complaint appears to be premised on the fact that AT&T submitted an inquiry after being specifically asked not to do so during the December 17, 2013 phone call. *See* (Compl. ¶¶ 18–24, ECF No. 1). However, Plaintiff also alleges that the offending credit inquiry occurred on March 27, 2013, approximately nine months before the allegedly triggering phone call. *See* (*id.*); *see also* (Screen Shot of Credit Report, ECF No. 1-2) (showing the credit injury occurred on March 27, 2013). Plaintiff does not explain this obvious inconsistency in his Complaint or in his Response to the Motion to Compel or Motion to Reconsider.

purchase of an iPhone and wireless plan on August 31, 2012 on behalf of Fierce Entertainment allegedly bearing Plaintiff's signature). The Customer Agreement accepted by Plaintiff contains an arbitration provision that states:

> **2.2   Arbitration Agreement**
> (1) AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. . . .
>
> References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us. . . . **You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.**

(Customer Agreement ¶ 2.2, Ex. 2 to Shurtz Decl., ECF No. 11-2).

AT&T's records show that approximately five months later on January 28, 2013, Plaintiff called AT&T to inquire about switching Fierce Entertainment's wireless service account to a business service account also in the name of Fierce Entertainment. (Clary Decl. ¶ 4, ECF No. 11-2). During this phone call, Plaintiff elected to transfer the wireless service account to a business service account, and as part of the transfer, Plaintiff gave a verbal acceptance of a "Mobile Business Agreement" (the "Business Agreement"). (*Id.*); *see* (Business Records Screenshot, Ex. 3 to Clary Decl., ECF No. 11-1) (showing a transfer of the accounts on January 28, 2013); (Agreement Signature Screenshot, Ex. 4 to Clary Decl., ECF No. 11-1) (indicating a verbal acceptance of the Business Agreement by Plaintiff on January 28, 2013). The three-page Business Agreement incorporates by reference a set of "General Terms and Conditions." *See* (Business Agreement at 1, Ex. 1 to Clary Decl., ECF No. 11-1). Included in the General Terms and Conditions is an arbitration provision that states:

> **9. Arbitration**. <u>The parties agree to exercise their best efforts to settle any dispute arising out of or related to this Agreement through good faith negotiation. Any dispute arising out of or related to this Agreement that cannot be resolved by negotiation shall be resolved by binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules . . . . THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE</u>

<u>OTHER ONLY IN ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  Furthermore, unless both parties agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific proviso is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.</u>

(General Terms and Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1).

On September 21, 2014, approximately twenty months after transferring accounts and accepting the Business Agreement, Plaintiff filed his Complaint. (Compl., ECF No. 1).  AT&T then filed its Motion to Compel Arbitration on November 17, 2014.  Plaintiff filed a Response to the Motion to Compel (ECF No. 17) on December 18, 2014, and AT&T filed its Reply (ECF No. 21) on January 16, 2015.

On August 21, 2015, the Court entered an Order denying the Motion to Compel.  AT&T subsequently filed its pending Motion to Reconsider on September 2, 2015, and on October 3, 2015, Plaintiff filed his Response.[3]

## II. LEGAL STANDARD

### A. Motion to Reconsider

A motion to reconsider a final appealable order is appropriately brought under either Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991); *see also United States v. Martin*, 226 F.3d 1042, 1048, n.8 (9th Cir. 2000).  When a motion to reconsider is timely filed within the 28-day period specified under the statute, it is treated as a Rule 59(e) motion. *See Am. Ironworkers & Erectors Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 899 (9th Cir. 2001).

---

[3] AT&T also filed a Notice of Appeal of the Court's Order (ECF No. 35) on September 21, 2015, after filing its Motion to Reconsider.  However, Pursuant to the Federal Rules of Appellate Procedure, if a party files a notice of appeal after entry of judgment but before the district court rules on a motion to reconsider, the notice only becomes effective after the court rules on the motion to reconsider. Fed. R. App. P. 4(a)(4)(B)(i).

Motions for reconsideration under Rule 59(e) are committed to the discretion of the trial court. *See School Dist. No. 1J. Mutlinomah County v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). However, absent highly unusual circumstances, a district court should not grant a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure unless the court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Id.* at 1263; *see also Allstate Ins. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). Furthermore, although the court enjoys discretion in granting or denying a motion under this rule, "amending a judgment after its entry remains an extraordinary remedy which should be used sparingly." *Herron*, 634 F.3d at 1111 (quoting *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999)) (internal quotations omitted).

### B. Motion to Compel Arbitration

Section 2 of the Federal Arbitration Act (the "FAA") provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Courts shall place arbitration agreements "upon the same footing as other contracts." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

Under the FAA, parties to an arbitration agreement may seek an order from the Court to compel arbitration. 9 U.S.C. § 4. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*

*Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Thus, the Court's "role under the Act is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1261 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (internal quotations omitted)). If a district court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1276–77 (9th Cir. 2006).

### III. DISCUSSION

#### A. Motion to Reconsider

In the Order denying the Motion to Compel, the Court relied on the Supreme Court of Nevada's decision in *Picardi v. Eighth Judicial Dist. Court of State, ex rel. Cnty. of Clark*, 251 P.3d 723 (Nev. 2011), for the position that class action waivers in arbitration agreements violate public policy and are unenforceable in Nevada. *See* (Order 6:6–9:8, ECF No. 29). However, as noted in AT&T's Motion to Reconsider, this state law was implicitly overruled by the Supreme Court of the United States in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), where the Court held that the FAA preempted a similar public policy in California invalidating arbitration agreements with class action waivers. 131 S. Ct. at 1746–48. Furthermore, in a recent decision entered after this Court's Order, the Supreme Court of Nevada recognized that *Concepcion* abrogated its prior decision in *Picardi*. *See Tallman v. Eighth Judicial Dist. Court of State ex rel. Cnty. of Clark*, 131 Nev. Adv. Op. 71, at *5–6 (2015). Accordingly, because Nevada's public policy against class action waivers cannot be a basis for invalidating the arbitration agreement, AT&T's Motion to Reconsider is granted.

#### B. Motion to Compel

Having now granted AT&T's Motion to Reconsider, the Court will reanalyze the arguments from the parties' briefs for the Motion to Compel. In its Motion to Compel, AT&T

contends that Plaintiff is obligated under the Business Agreement to bring his claims against it in arbitration. (Mot. to Compel 2:22–27, ECF No. 11).  In his Response, Plaintiff presents three arguments for why he should not be compelled to arbitrate his claims: (1) AT&T has unfairly attempted to simultaneously compel arbitration under two different provisions, (2) the arbitration provisions are unconscionable, and (3) his claims fall outside the scope of the arbitration provisions. (Resp. 2:23–3:3, 7:11–9:22, ECF No. 17).  However, all of these arguments are unpersuasive.

### A. The applicable arbitration provision is the one incorporated into the Business Agreement.

Plaintiff's first argument is that because AT&T is attempting to compel arbitration under the provisions contained in both the Customer Agreement and the Business Agreement, it is unclear which arbitration provision applies. (Resp. 7:11–9:22, ECF No. 17).  Therefore, because of this confusion, it would be unfair to apply either provision against Plaintiff. (*Id.*). This argument, however, misstates AT&T's position, and is unavailing.

AT&T is not attempting to compel arbitration under both provisions simultaneously but rather is asserting that while the arbitration provision incorporated into the Business Agreement controls, if Plaintiff prefers, AT&T is willing to arbitrate under the provision in the Customer Agreement, which it contends possesses more "consumer-friendly" features. *See* (Mot. to Compel 6:10–18, ECF No. 11); (AT&T Reply 4:16–5:15, ECF No. 21).  Plaintiff even acknowledges later in his Response that AT&T stated that Plaintiff is no longer bound by the arbitration provision in the Customer Agreement because the Business Agreement superseded it. (Resp. 26:10–28:6, ECF No. 17).  Accordingly, the Court rejects Plaintiff's first argument, and in ruling on the motion, the Court will determine whether the arbitration provision incorporated into the Business Agreement compels Plaintiff to arbitrate his claim.

**B. The Business Agreement arbitration provision is not unconscionable.**

Plaintiff's second argument against compelling arbitration is that the Business Agreement and incorporated General Terms and Conditions are unconscionable and thus invalid. (Resp. 19:11–26:9, ECF No. 17). Specifically, Plaintiff contends that the arbitration provision is procedurally unconscionable because Plaintiff was denied any opportunity to bargain over the terms and because the location and format of the provision rendered it inconspicuous and difficult to read. (*Id.* 21:19–24:28). Furthermore, Plaintiff contends that the arbitration provision is substantively unconscionable because it is overly broad in scope. (*Id.* 25:1–26:9).

"In determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). In this case, however, there is some question about which state's law to apply because while the Business Agreement was entered into by Plaintiff in Nevada, the incorporated General Terms and Conditions contains a choice-of-law provision declaring that Georgia law controls. (General Terms and Conditions, Ex. 7 to Clary Decl. ¶ 13.5, ECF No. 11-1). "In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state. . . ." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). "Nevada's choice-of-law principles permit parties within broad limits to choose the law that will determine the validity and effect of their contract. The situs fixed by the agreement, however, must have a substantial relation with the transaction, and the agreement must not be contrary to the public policy of the forum, or other interested state." *Progressive Gulf Ins. Co. v. Faehnrich*, 327 P.3d 1061, 1064 (Nev. 2014) (citations omitted).

Here, there is no apparent fundamental policy of Nevada that needs protection. However, there is also no apparent relation—let alone a substantial one—between Georgia and the transaction. Neither party is a citizen of Georgia, and the transaction at issue here occurred while Plaintiff was in Nevada and concerns a wireless phone service to be used primarily in Nevada. Furthermore, AT&T provides no evidence or argument showing any relation between Georgia and the transaction leading to this suit. Instead, AT&T merely states that the choice of law is irrelevant because the arbitration provision incorporated into the Business Agreement is enforceable under either Georgia or Nevada law. *See* (Mot. to Compel n.7, ECF No. 11). Accordingly, the Court finds that Nevada law controls and will apply Nevada law in determining whether the arbitration provision is enforceable.

When reviewing an arbitration clause's conscionability under Nevada law, courts look for both procedural and substantive unconscionability. *Gonski v. Second Judicial Dist. Court of State ex rel. Washoe*, 245 P.3d 1164, 1169 (Nev. 2010). "Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a clause as unconscionable." *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004). "An arbitration clause is procedurally unconscionable when a party has no meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." *Gonski*, 245 P.3d at 1169. "Substantive unconscionability, in contrast, is based on the one-sidedness of the arbitration terms." *Id.*

Here, the Business Agreement with the incorporated General Terms and Conditions is a contract of adhesion because AT&T presented it to Plaintiff on a "take it or leave it" basis without any real opportunity to bargain over its terms. *See Burch v. Second Judicial Dist. Court of State ex rel. Cnty. of Washoe*, 49 P.3d 647, 649 (Nev. 2002) ("This court has defined an adhesion contract as a standardized contract form offered to consumers on a 'take it or leave it'

basis, without affording the consumer a realistic opportunity to bargain."); *see also* (Clary Decl. ¶¶ 4–6, ECF No. 11-2) (explaining the process by which Plaintiff was presented with and verbally accepted the Business Agreement over the phone, after which the actual terms of the agreement were emailed to him). Accordingly, the Business Agreement is procedurally unconscionable under Nevada law. *See Gonski*, 245 P.3d at 1169.

However, "adhesion contracts are not unenforceable per se." *Mallin v. Farmers Ins. Exch.*, 839 P.2d 105, 118 (Nev. 1992). For an adhesion contract to be unenforceable, it must also be substantively unconscionable; in other words, its terms must also be "unduly oppressive." *See Obstetrics & Gynecologists William G. Wixted, M.D., Patrick M. Flanagan, M.D., William F. Robinson, M.D. Ltd. v. Pepper*, 693 P.2d 1259, 1261 (Nev. 1985) ("An adhesion contract need not be unenforceable if it falls within the reasonable expectations of the weaker or 'adhering' party and is not unduly oppressive."); *see also Gonski*, 245 P.3d at 1169 ("[A] showing of both types of unconscionability is necessary before an arbitration clause will be invalidated . . . . Generally, in considering substantive unconscionability, courts look for terms that are 'oppressive.'"). The only term of the arbitration provision that Plaintiff argues is substantively unconscionable relates to the scope of what claims must be arbitrated. (Resp. 25:1–26:9, ECF No. 17). This provision states: "Any dispute arising out of or related to this Agreement that cannot be resolved by negotiation shall be resolved by binding arbitration . . . ." (General Terms and Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1). Plaintiff contends that under this term, the scope of the arbitration provision is substantively unconscionable because it is overly broad and "would, for all intents and purposes, bind Plaintiff . . . to arbitration for his entire lifetime, for any type of wrong committed by AT&T regardless of whether or not it was in any way related to Plaintiff's account." (Resp. 25:25–28, ECF No. 17). Plaintiff, however, contradicts this hyperbolic language later in his Response by arguing at length that his claims here do not fall within the scope of the provision. *See* (*id.* 10:15–19:10).

Plaintiff also fails to cite any Nevada law indicating that a broad scope renders an arbitration clause to be invalid. Moreover, numerous courts in Nevada and other states have found arbitration provisions containing equally broad language concerning the scope of the provision to be conscionable and enforceable. *See, e.g.*, *Henderson v. Watson*, 2015 WL 2092073, at *1 (Nev. Apr. 29, 2015) (finding as conscionable an arbitration provision "providing that all disputes would be resolved through binding arbitration"); *Zabelny v. CashCall, Inc.*, 2014 WL 67638, at *2 (D. Nev. Jan. 8, 2014), *appeal dismissed* (Apr. 15, 2014) (finding as conscionable a provision "requiring arbitration of 'any dispute or controversy arising out of, relating to, or concerning' his employment"); *Crawford v. Great Am. Cash Advance, Inc.*, 644 S.E.2d 522, 524 (Ga. Ct. App. 2007) (finding as conscionable an arbitration provision encompassing "[a]ny and all disputes or disagreements between the parties arising out of this agreement or any prior agreement"); *see also Concepcion*, 131 S. Ct. at 1744, (upholding an arbitration provision that required arbitration of "all disputes between the parties"). Further, the broad scope of the arbitration provision equally applies to any claims AT&T may wish to bring against Plaintiff, so such a broad scope cannot be said to be unreasonably one-sided in its terms. *See Gonski*, 245 P.3d at 1169 ("Substantive unconscionability . . . is based on the one-sidedness of the arbitration terms."). Accordingly, the arbitration provision here is not substantively unconscionable and is therefore enforceable under Nevada law.

**C. The Business Agreement arbitration provision encompasses Plaintiff's claims.**

Plaintiff's final argument against compelling arbitration is that the claims raised in his Complaint do not fall within the scope of the arbitration provision. (Resp. 4:22–5:7, 9:23–19:10, 26:10–27:6, ECF No. 17). Specifically, Plaintiff contends that the dispute at issue here relates to a phone call between himself and AT&T over the creation of a personal account and has no relation to Business Agreement between Fierce Entertainment and AT&T. (*Id.* 10:15–19:10). In essence, Plaintiff's argument relies on two premises: (1) that the arbitration

provision is only binding on Fierce Entertainment and not on Plaintiff personally and (2) that the phone call triggering the credit inquiry had no relation to the Business Agreement and Fierce Entertainment's business account. (*Id.*). The Court rejects both of these premises.

First, the Business Agreement arbitration provision is binding upon Plaintiff under the alter ego doctrine. In Nevada, arbitration agreements may bind nonsignatories under an alter ego theory of veil piercing. *See Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1241 (D. Nev. 2008) (citing *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 532 (5th Cir. 2000)) (finding under an alter ego theory that a nonsignatory could be bound to a contract); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (stating that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles," such as "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel"); *see also Bates v. Chronister*, 691 P.2d 865, 869 (Nev. 1984) (noting a nonparty who is an alter ego could function as a party to a contract for purposes of rescinding the contract). "In order to hold an individual liable under an alter ego theory, the plaintiffs must show: (1) the corporation was influenced and governed by the person asserted to be the alter ego; (2) there is such unity of interest and ownership that one is inseparable from the other; and (3) the facts are such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice." *Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100, 1122 (D. Nev. 2014) (citing *LFC Mktg. Group Inc. v. Loomis*, 8 P.3d 841, 846–47 (Nev. 2000)). Furthermore, the alter ego doctrine may be invoked regardless of whether the business sought to be pierced is a corporation, partnership, or proprietorship. *UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1476 (9th Cir. 1994); *see also United Parcel Serv. of Am., Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005) ("A sole proprietorship is a business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal

capacity. In contrast to a corporation, a sole proprietorship has no separate existence, but rather exists as the so-called 'alter ego' of the owner.") (citation omitted).[4]

Here, all three of the elements for applying alter ego liability have been met. First, Fierce Entertainment is governed and influenced by Plaintiff. Plaintiff has admitted that he is the owner of Fierce Entertainment, and at the very least, Plaintiff has sufficient influence over Fierce Entertainment to have entered into the Customer Agreement and Business Agreement on its behalf. (Pl. Decl. ¶ 2, ECF No. 17-1) ("I am the owner of Fierce Entertainment."); (Agreement Signature Screenshot, Ex. 4 to Clary Decl., ECF No. 11-1). Additionally, AT&T's records indicate that Plaintiff, and only Plaintiff, has called on behalf of the service plans held by Fierce Entertainment. (AT&T Call Records, Ex. 1 to Shurtz Decl., ECF No. 11-2).

Second, there is such a unity of ownership and interest between Plaintiff and Fierce Entertainment that one is inseparable from the other. The billing address for Fierce Entertainment's account, *see* (AT&T Call Records, Ex. 1 to Shurtz Decl., ECF No. 11-2), and the business address associated with Fierce Entertainment's business license, *see* (List of Business Licenses, Ex. 3 to Tierney Decl., ECF No. 11-3), is listed with the Lyon County Nevada Assessor's Office as a single family residence owned by Plaintiff and Jamie A. Rodriguez in the town of Fernley, Nevada (Real Property Inquiry Screenshot, Ex. 4 to Tierney Decl., ECF No. 11-3). This shared address of a single family residence, coupled with the complete absence of any corporate formalities for Fierce Entertainment in the record, weighs in favor of finding a unity of interest. *See Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 701

---

[4] The corporate form of Fierce Entertainment is not clear from the record. However, given Plaintiff's admission that he is the "owner" of Fierce Entertainment, the record of a business license issued to Plaintiff on behalf of Fierce Entertainment, and the lack of any record of corporate formalities or of incorporation for Fierce Entertainment, it appears that Fierce Entertainment is a sole proprietorship operated by Plaintiff. *See* (List of Business Licenses, Ex. 3 to Tierney Decl., ECF No. 11-3) (showing a business license for Fierce Entertainment was issued to Plaintiff); (Pl. Decl. ¶ 2, ECF No. 17-1) ("I am the owner of Fierce Entertainment."); (Nevada Sec. of State Screenshots, Exs. 1 & 2 to Tierney Decl., ECF No. 11-3) (showing no corporation named Fierce Entertainment registered in Nevada); *see also* (Mot. to Compel 13:5–15, ECF No. 11) (asserting the Fierce Entertainment is a sole proprietorship, which Plaintiff does not refute in his Response).

(7th Cir. 2010) (affirming the district court's finding of "unity of interest" for alter-ego purposes because there was "scant existence" of the business apart from its individual owners, where the owners "do[] not observe corporate formalities" and the "corporate headquarters is the [owners'] residence"); *see also UMG Recordings, Inc. v. BCD Music Grp., Inc.*, 2011 WL 798901, at *4 (C.D. Cal. Feb. 25, 2011) (finding alter ego status where the entities share, among other things, "the same corporate formalities" and "the same place of business"), *aff'd*, 509 F. App'x 661 (9th Cir. 2013).

Third, given that Plaintiff appears to have received the entire benefit of Fierce Entertainment's service plan and that there is no evidence in the record of any corporate formalities—including the mere existence of the corporate form—it would be unjust to adhere to the corporate fiction of a separate entity. *See* (AT&T Call Records, Ex. 1 to Shurtz Decl., ECF No. 11-2) (showing Plaintiff as the owner and sole caller for Fierce Entertainment's account). Indeed, in Plaintiff's Response, he fails to even offer an argument against his being indistinguishable from and the alter ego to Fierce Entertainment. Accordingly, under the alter ego doctrine, Plaintiff is bound under the arbitration provision as equally as Fierce Entertainment.

Turning to Plaintiff's second argument, the Court finds that Plaintiff's claims arising from a phone call allegedly triggering a credit inquiry and the Business Agreement are sufficiently related to fall within the scope of the arbitration provision. The language of the applicable arbitration provision requires arbitration of "[a]ny dispute arising out of or related to" the Business Agreement. (General Terms and Conditions ¶ 9, Ex. 7 to Clary Decl., ECF No. 11-1). The Ninth Circuit has interpreted this language broadly as providing coverage over any disputes between the parties that are even collaterally related to the contract. *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922–23 (9th Cir. 2011) (citing *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983)); *see Ulbrich v. Overstock.Com,*

*Inc.*, 887 F. Supp. 2d 924, 931 (N.D. Cal. 2012) ("An agreement which contains an arbitration clause covering disputes 'arising out of or relating to the contract or breach thereof' encompasses tort claims having their roots in the contractual relationship between the parties . . . ."); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("[T]he language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract. To require arbitration, Simula's factual allegations need only 'touch matters' covered by the contract . . . ."). Therefore, so long as the phone call that allegedly triggered the offending credit inquiry collaterally touches upon the Business Agreement or has some roots in the contractual relationship between the parties, Plaintiff's claims fall within the scope of the arbitration provision.

The significance of the relation between the phone call and the Business Agreement is somewhat disputed between the parties. In the Motion to Compel and Reply, AT&T argues that Plaintiff's claims are related to the Business Agreement and points to its call records for Fierce Entertainment's account, which show that Plaintiff and a customer service representative discussed "transfer of billing responsibility" on the Fierce Entertainment account during the phone call that is likely the same call alleged in the Complaint as triggering the credit inquiry. *See* (Mot. to Compel 10:13–20, ECF No. 11); (Reply 1:18–23, ECF No. 21); *see also* (AT&T Call Records, Ex. 1 to Shurtz Decl., ECF No. 11-2) (showing Plaintiff called on January 13, 2014 and inquired about transferring billing responsibility and asked not to have his credit run; also showing that the last prior communication with Plaintiff was on October 29, 2013 rather than in December of 2013). In his Response, Plaintiff argues that his claims are "isolated incidents that do not arise out of Fierce Entertainment's account, prior related accounts, or any sort of relationship with AT&T." (Resp. 12:6–20, ECF No. 17). However, Plaintiff does not explicitly refute that the phone call where he requested no credit inquiry be taken also involved

a discussion concerning the transfer of billing responsibility on Fierce Entertainment's account. *See* (*id.*). Moreover, given that the credit report attached to the Complaint shows the offending credit inquiry occurred on March 27, 2013, it seems more likely that such an inquiry was run as a result of Plaintiff's call on January 28, 2013—the very call in which he accepted the Business Agreement and transferred Fierce Entertainment's account to a business service account—rather than as a result of a later December 17, 2013 or January 13, 2014 phone call. Additionally, even if the Fierce Entertainment account was not directly discussed during the phone call leading to the claims alleged in the Complaint, that phone call—in which Plaintiff alleges he discussed obtaining a personal account in his own name—likely still has its roots in Plaintiff's familiarity with AT&T services based on his prior use of the account in the name of Fierce Entertainment.

Most importantly however, though the factual disputes over the content and timing of the triggering phone call cause some doubt over whether Plaintiff's claims fall within the scope of the arbitration provision, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cape Flattery*, 647 F.3d at 922–23 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983)); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) ("The first principle is that where, as here, parties concede that they have agreed to arbitrate *some* matters pursuant to an arbitration clause, the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration."). Furthermore, the "strong presumption in favor of arbitrability 'applies with even greater force' when [the 'arising out of or related to'] broad arbitration clause is at issue." *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991))

(internal citation omitted).  Accordingly, though it is somewhat unclear whether the phone call that triggered a credit inquiry—and consequently Plaintiff's claims—also directly involved some aspect of the relation between the parties arising from the Business Agreement, given the broad language of the arbitration provision and the strong presumption in favor of arbitration, the Court finds that Plaintiff's claims fall within the scope of the arbitration provision. *See Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804–05 (N.D. Cal. 2004) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960) ("[A]n order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.").  Therefore, having now rejected all of Plaintiff's arguments against enforcing the arbitration provision, the Court finds that the arbitration provision incorporated into the Business Agreement is valid and enforceable and necessitates arbitration of Plaintiff's claims.

## IV.     CONCLUSION

**IT IS HEREBY ORDERED** that AT&T's Motion to Reconsider (ECF No. 33) is **GRANTED**.

**IT IS FURTHER ORDERED** that AT&T's Motion to Compel Arbitration (ECF No. 11) is **GRANTED**.  Accordingly, these proceedings are stayed pending the outcome of arbitration.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report by May 1, 2016 notifying the Court of the status of arbitration in this action and shall file further reports every 90 days as necessary until the conclusion of arbitration.

**DATED** this __20__ day of October, 2015.

_____
Gloria M. Navarro, Chief Judge
United States District Court